CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
AUG 21 2012
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

AL-AKHIR I. M. BRYANT,
    Plaintiff,

                    Civil Action No. 7:11-cv-00075

v.

                    **MEMORANDUM OPINION**

GENE M. JOHNSON, et al.,
    Defendants.

                **By:**    **Hon. Jackson L. Kiser**
                           **Senior United States District Judge**

       Al-Akhir I. M. Bryant, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), § 2000cc, et. seq. By a Supplemented Amended Complaint, plaintiff names as defendants Gene M. Johnson, former Director of the Virginia Department of Corrections ("VDOC"); former VDOC Deputy Director John Jabe; VDOC Western Regional Director John Garman; Randall Mathena, Warden of the Keen Mountain Correctional Center ("KMCC"); KMCC Assistant Warden J. Kiser; KMCC Inmate Classification Authority D. Vass; KMCC Chief of Security E. Newberry; and KMCC correctional officers Captain R. D. Kelly, Lieutenant P. Cox, Sergeant G. Horn, Sergeant M. Hatfield, Walk, Webb, O'Quinn, Childress, P. Tuggle, J. Brown, and K. Allen.[1]

       The facts and claims for this case exemplify the challenges of prison administration. A KMCC official received a tip that plaintiff threatened to harm staff. Plaintiff was moved to segregation during the investigation, and he argues that his placement in segregation is due to retaliation for prior complaints about KMCC. KMCC staff then reviewed plaintiff's conduct and

---

[1] Plaintiff names Vass, Newberry, Kelly, Horn, Hatfield, Walk, Webb, O'Quinn, Childress, Tuggle, Brown, and Allen in their individual capacities. Plaintiff names Johnson, Jabe, Garman, Mathena, and Kiser in both official and individual capacities. Plaintiff named Cox in an individual capacity in the Amended Complaint but named Cox in only an official capacity in the supplement to the Amended Complaint. For the reasons discussed in this Memorandum Opinion, Cox would be entitled to qualified immunity if plaintiff had continued to name her in an individual capacity.

recommend a higher security classification, and plaintiff consequently refused to eat seventeen consecutive meals. KMCC staff asked plaintiff to step on a scale to be weighed, he refused, and KMCC staff had to force him to simply step on a scale for a few seconds. He filed multiple grievances, saying that his cell was "filthy" and subjected him to the risk of diseases, which he did not get. A correctional officer did not politely speak to him, and he believes this disrespect warrants damages. None of these complaints entitle him to his requested relief, and I grant defendants' motions for summary judgment.

# I.

After learning of plaintiff's alleged threats to harm KMCC staff, Hatfield authorized plaintiff's transfer to segregation on December 15, 2008. Plaintiff denied making any threat and accused Hatfield and other staff of retaliating against him for his prior complaints about KMCC staff and conditions.[2]

Cox conducted plaintiff's ICA hearing[3] on January 27, 2009.[4] Based on plaintiff's prior infractions and the accusation about threats, plaintiff's security classification increased, which then required plaintiff's transfer to a more secure, Level V facility. Plaintiff faults Mathena,

---

[2] Plaintiff attaches various grievances and letters to prison officials to support the retaliation claim. (Am. Compl. (no. 18) Ex. A-Q.) These grievances and letters concerned backed-up toilets, haircuts, recreation, food quantity, and the issues sub judice. Plaintiff faults Mathena for not transferring plaintiff to another facility despite allegedly knowing, based on plaintiff's letters and grievances, of plaintiff's problems with KMCC staff.

[3] An ICA hearing is conducted whenever an inmate is scheduled for an annual review, formal due process hearing, or an informal hearing, depending on the hearing's purpose. A formal due process hearing is required whenever there is an opportunity for the inmate to be removed from the general population or receive a reduction in good time earning level. (Taylor Aff. ¶ 4.) The ICA hearing officer completes a "Class Level Evaluation Sheet," which uses a point system to evaluate the inmate. The factors considered during the ICA hearing review are security levels, institutional assignments, program participation, work classification, job assignments, institutional infractions, and any other decisions affecting the inmate. (Id. ¶ 5.) The total number of earned points determines an inmate's security level.

[4] Plaintiff filed a grievance about being in segregation between December 2008 and January 2009. Garman agreed that plaintiff's time in segregation exceed the time permitted by VDOC policy, but Vass authorized plaintiff's continued segregation because Hatfield had not yet filed a report about plaintiff's threats.

2

Kiser, and Vass for not appointing someone other than Cox to conduct plaintiff's ICA hearing because Cox was a target of the alleged threats. Plaintiff accuses defendants without support of increasing his security classification and instituting a prison transfer as retaliation for his complaints about KMCC to a Congressman, the VDOC Inspector General, and other VDOC officials.

Soon after the ICA hearing, plaintiff stopped eating, either for a religious fast, as plaintiff alleges, or for a hunger strike, as defendants allege. A Qualified Mental Health Professional ("QMHP") ordered that plaintiff's weight be measured on February 6, 2009, but plaintiff refused all orders to be weighed.

By February 9, 2009, plaintiff had refused to eat seventeen consecutive meals and was ordered to a strip cell, which plaintiff claims was retaliation for exercising a religious fast, in violation of the First Amendment and RLUIPA.[5] That same day, Cox, Horn, Tuggle, Brown, Childress, Webb, Walk, and O'Quinn escorted plaintiff to the strip cell door. Plaintiff, who was wearing handcuffs and leg irons, refused Cox's first order to step on a scale to be weighed. Pursuant to Horn's subsequent order, Tuggle held plaintiff's left arm, Brown held his right arm, and Walk and O'Quinn held plaintiff's legs as he stood in front of the scale. Pursuant to Cox's order, Childress stood behind plaintiff with the NOVA shield.[6]

Cox then ordered Tuggle, Brown, Walk, and O'Quinn to place plaintiff on the scale to be weighed. Plaintiff "exercised [his] right not to be forced to be weighed because there's no [V]DOC policy or state laws or federal laws that gives them the right to weigh [him] on the scale

---

[5] Cox avers that Newberry told her to move plaintiff to the strip cell. Horn avers that the QMHP ordered plaintiff moved to the strip cell.
[6] A NOVA shield is a tall, handheld shield of Plexiglas that protects an officer from physical attack and can administer an electronic shock to a person in contact with the front of the shield.

3

or use force for [his] refusal to consent to be weighed." Cox avers that plaintiff resisted by kicking at the officers and pushing himself off the door in front of the scale when the officers lifted him up. Plaintiff denies kicking at the officers and alleges he merely lifted his legs, which were being held by two officers, to prevent being weighed.

Cox repeated the order to be weighed, told Childress to put the NOVA shield against plaintiff's back, and authorized Childress to use the NOVA shield if plaintiff still refused to be weighed.[7] Despite hearing the warning about the NOVA shield, plaintiff again resisted the order by moving his legs and refusing to be weighed. Childress used the NOVA shield to shock plaintiff for one second, and plaintiff still refused to go on the scale. Plaintiff says Cox gave a third order for plaintiff to be weighed, plaintiff again refused to get on the scale, and Childress again shocked plaintiff with the NOVA shield for one second. Tuggle, Brown, Walk, and O'Quinn then managed to get plaintiff on the scale and inside the strip cell.[8]

Plaintiff thought the cell was filthy, but Horn inspected it and determined it was clean.[9] Plaintiff undressed in the cell, and staff discovered tobacco hidden inside plaintiff's underwear. A nurse medically assessed plaintiff once he stripped, the nurse did not find any injury, and plaintiff did not voice any complaint. Plaintiff was then given boxer shorts to wear and remained in the strip cell until March 2, 2009.[10]

---

[7] Cox acknowledges that she did not call Newberry for approval to use force.

[8] Plaintiff filed grievances about these events, and Garman concluded that plaintiff's accusation of excessive force was "founded." However, plaintiff faults Garman for not explaining a legitimate reason why staff needed to move plaintiff to a strip cell. Plaintiff filed more grievances and alleges that the QMHP did not "hav[e] anything to do with [plaintiff] being placed in the strip cell."

[9] Plaintiff repeatedly describes the cell as "filthy" or "unclean" without any specific information except that the toilet did not flush properly and the cell smelled of urine and feces. (Pl.'s Resp. (no. 48-4) ¶ 58.)

[10] Institutional records reflect that, on February 9, 2009, staff gave plaintiff his personal property by 4:00 p.m. and stopped fifteen-minute observations by 5:30 p.m. Plaintiff resumed strip-cell status on February 13, 2009, with fifteen minute observations. Plaintiff stopped fasting and received all normal privileges on February 14, 2009.

4

Mathena and Garman denied plaintiff's subsequent grievances about how the cell's uncleanliness subjected him "to the possibility" of contracting diseases. Plaintiff alleges that Mathena and Garman failed to properly investigate the issue beyond watching video footage from a pod camera. Garman upheld the decision to move plaintiff into the strip cell because staff believed plaintiff was on a hunger strike, which plaintiff challenges as a "false and specious" report "made or issued by the security staff themselves or their close-cronies or their family members." Plaintiff argues that his placement in a strip cell was retaliation for his religious fast and that Garman "should have known" that placing plaintiff in strip cell for missing seventeen meals violated VDOC policy.

Plaintiff had a second ICA hearing on February 27, 2009, during which Cox "disrespected" plaintiff. Cox said plaintiff was a "typical inmate" who is "known to be disrespectful." Plaintiff believes he is entitled to damages for Cox's "disrespect."

## II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth

5

specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).  A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility.  Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  A court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."  Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).  A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment.  See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff

6

may not amend a complaint through argument in a brief opposing summary judgment); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (same).

Plaintiff alleges in the Amended Complaint that Allen was a member of the cell entry team involved with weighing him on February 9, 2009. Allen avers that he was not working at the KMCC on February 9, 2009, could not have been a member of the cell-entry team, and had no involvement with plaintiff. Plaintiff concedes that he cannot show any evidence that Allen was present. Finding no dispute of material fact, Allen is entitled to summary judgment for the claims arising from the events on February 9, 2009.

### A. PLAINTIFF CANNOT RECOVER DAMAGES AGAINST JOHNSON OR JABE FOR THE ALLEGED RLUIPA VIOLATION.

Plaintiff seeks damages against Johnson and Jabe in both their official and individual capacities. RLUIPA does not authorize claims for money damages against Johnson and Jabe in their official capacities. Madison v. Virginia, 474 F.3d 118, 133 (4th Cir. 2006). RLUIPA also does not authorize claims for money damages against Johnson and Jabe in their individual capacities. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009).[11] Accordingly, plaintiff may not recover damages for the RLUIPA claim.

### B. PLAINTIFF MAY NOT RECOVER FOR CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

Defendants Johnson, Jabe, Garman, Mathena, Kiser, Vass, Newberry, Kelly, Cox, Horn, Hatfield, Walk, Webb, O'Quinn, Childress, Tuggle, Brown, and Allen assert that the § 1983 claims asserted against them in their individual capacities are prevented by the doctrine of qualified immunity. Qualified immunity permits "government officials performing discretionary

---

[11] Rendelman addresses claims for damages against a state or a state official under only the Spending Clause axis of RLUIPA. Plaintiff fails to allege any facts suggesting that his claims against Johnson and Jabe could qualify as actionable claims under the Commerce Clause section of RLUIPA, and I decline to construct the claim for plaintiff.

7

functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit rather than a mere defense to liability. Thus, whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first).

Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right, and the defendant must prove that the right violated was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). After reviewing plaintiff's allegations, I find that plaintiff fails to show that any defendant violated any of plaintiff's rights. Accordingly, the defendants are entitled to qualified immunity from damages in their individual capacities.

8

1. Defendants' alleged violations of VDOC policies and procedures do not present an actionable § 1983 claim.

Plaintiff alleges throughout the Amended Complaint that defendants failed to follow various VDOC policies and procedures when interacting with plaintiff, responding to grievances, providing services, enforcing discipline, keeping plaintiff in investigative detention for more than ten days, or maintaining the prison. A claim that prison officials have not followed their own independent policies or procedures does not state an actionable § 1983 claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue). Accordingly, defendants are entitled to qualified immunity for plaintiff's claims that they violated VDOC policies and procedures.

2. Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity for allegedly using excessive force in violation of the Eighth Amendment by using a shock shield.

Plaintiff accuses Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn of using excessive force, in violation of the Eighth Amendment, by using the NOVA shield. A prisoner alleging excessive force must objectively show that a defendant "inflicted unnecessary and wanton pain and suffering." Whitley v. Albers, 475 U.S. 312, 320 (1986). See Wilson v. Seiter, 501 U.S. 294, 298 (1991) (holding that an Eighth Amendment claim for excessive force requires an objective deprivation of a basic human need and that prison officials subjectively acted with a sufficiently culpable state of mind). Therefore, the proper inquiry is whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. The subjective

9

component encompasses "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." Id. at 321 (internal quotation marks, alterations, and citation omitted). The objective element generally requires more than a de minimis use of force. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid [Eighth Amendment] excessive force claim." Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175, 1178 (2010). Courts recognize that correctional officials must act "in haste, under pressure, and frequently without the luxury of a second chance." Whitley, 475 U.S. at 320. Consequently, I must give prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Hudson, 503 U.S. at 7.

Based on plaintiff's Amended Complaint and the undisputed evidence, Cox and Childress did not authorize or use the NOVA shield maliciously or sadistically for the very purpose of causing harm.[12] Over several days, plaintiff persistently disobeyed orders to be weighed so prison officials could ensure plaintiff's fast was not a threat to his own health. See, e.g., Farrow v. West, 320 F.3d 1235, 1243-44 (11th Cir. 2003) (recognizing that weight loss may be a serious medical need for purposes of the Eighth Amendment). Immediately before plaintiff was placed in the strip cell for observation, Cox again ordered plaintiff to be weighed, but plaintiff continued to challenge officers' authority, asserting that he did not have to follow orders with which he did not agree. Plaintiff repeatedly acknowledges he was warned that Childress would use the NOVA shield to shock him if he did not comply with orders to be weighed. Despite hearing the warning

---

[12] The VDOC's decision to consider the unauthorized use of the shock shield to be excessive is not determinative of the Eighth Amendment analysis.

10

about the NOVA shield, plaintiff physically resisted the second order with such force to prohibit the correctional officers, who each held a shackled limb, from placing him on the scale. Childress applied a one-second shock like Cox had warned. Plaintiff admits in the Amended Complaint that Cox gave him another chance to comply without any more force, he again physically refused, and Childress applied another one-second shock. After applying the NOVA shield for two, one-second bursts, plaintiff finally stood on the scale and was weighed.

Some type of force was necessary to compel plaintiff's compliance in light of his continued intransigence. Plaintiff's persistent refusal to do such a simple and inconsequential task as stepping on a scale demonstrates the extent of plaintiff's challenge to institutional discipline and exemplifies the need for force. Clearly, tackling plaintiff onto the scale would not satisfy the goal of obtaining an accurate weight. Pepper spray in a common area while staff surrounding plaintiff would likely do more harm to others than to compel plaintiff to step on the scale while suffering the lingering effects of the spray. The two, one-second bursts caused no medical complication, unlike physical force, and no lingering effects, unlike pepper spray, and plaintiff did not suffer any injury from the NOVA shield. See, e.g., Collins v. Scott, 961 F. Supp. 1009, 1016-17 (E.D. Tx. 1997) (noting no constitutional violation where correctional officers used a shock shield when an inmate refused to submit to a strip search because the shield was the least restrictive means of maintaining control of the prisoner). The two, one-second bursts effectuated voluntary compliance after days of violating orders, and no injury resulted. Tuggle, Brown, Walk, and O'Quinn's grasps on plaintiff's limbs were de minimis uses of force that did not violate the Eighth Amendment. Accordingly, Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity because they did not use excessive force in violation of the Eighth Amendment.

11

3. Garman, Mathena, Kiser, Newberry, and Kelly are entitled to qualified immunity for allegedly failing to properly train, supervise, investigate, follow policy, and take disciplinary action for Cox and Horn's allegedly unprofessional behavior and abuse of inmates.

Plaintiff accuses Garman, Mathena, Kiser, Newberry, and Kelly of failing to properly train, supervise, investigate, follow policy, and take disciplinary action for Cox and Horn's allegedly unprofessional behavior and abuse of inmates. Plaintiff cannot sue on behalf of other inmates who may have been allegedly abused by Cox and Horn. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61(1992) (holding that standing requires injury, causation, and redressability); Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997) (same).

Supervisory liability under § 1983 may not be predicated on the theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978). Section 1983 requires a showing of personal fault on the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs. See Fisher v. Washington Metropolitan Area Transit Author., 690 F.2d 1133, 1142-43 (4th Cir. 1982), abrogated on other grounds by Cnty. of Riverside v. McLaughlin, 500 U.S. 44 (1991) (finding that § 1983 requires a showing of personal fault on the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs).

Plaintiff does not describe how Cox and Horn allegedly abused plaintiff beyond using the NOVA shield, and plaintiff's claim about the NOVA shield must fail because Cox and Horn did not use excessive force in violation of the Eighth Amendment. Furthermore, plaintiff does not present any evidence that Garman, Mathena, Kiser, Newberry, or Kelly knew of, ordered, or condoned Horn and Cox's use of the NOVA shield. Plaintiff does not refute Cox's averment

12

that she did not inform Newberry or other superiors that she would use the NOVA shield.  See City of Canton v. Harris, 489 U.S. 378, 388-89 (2002) (holding that an actionable § 1983 inadequacy of training claim occurs only when the failure to train amounts to deliberate indifference to the rights of persons with whom the personnel come into contact).  Plaintiff does not establish "specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct, or (2) that a violation of a federal right is a 'highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Hill v. Robeson Cnty., 733 F. Supp. 2d 676, 687 (E.D.N.C. 2010) (citing Bd. Of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 407 (1997)).  Plaintiff also fails to describe Cox's or Horn's pattern of unconstitutional conduct.  See Meas v. City and Cnty. of San Francisco, 681 F. Supp. 2d 1128, 1142 (N.D. Cal. 2010) (noting that an actionable § 1983 failure to discipline claim is not proper for a single incident of unconstitutional conduct); Sexton v. Kenton Cnty. Det. Ctr., 702 F. Supp. 2d 784, 2010 WL 1050058 (E.D. Ky. 2010) (same).  Cox's alleged "disrespect" also does not state a constitutional claim.  See, e.g., Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979), cited favorably in Moody v. Grove, 885 F.2d 865 (4th Cir. 1989) (table) (unpublished) (stating as a general rule that mere verbal abuse of inmates by guards does not state a constitutional claim).  Accordingly, Garman, Mathena, Kiser, Newberry, and Kelly are entitled to qualified immunity for this claim.

    4.   Garman, Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn are entitled to qualified immunity for allegedly violating the Fourteenth Amendment.

Plaintiff accuses Garman, Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn of violating the Fourteenth Amendment by issuing false, inaccurate, and specious disciplinary reports; failing to investigate and conduct ICA hearings; placing plaintiff in a strip cell and

13

segregation; and relying on prior disciplinary charges to transfer plaintiff to a disciplinary institution. Plaintiff must prove that a defendant deprived him of a legitimate liberty or property interest to state a violation of procedural due process. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570 (1972). Thus, the first step to analyze a procedural due process claim is to identify whether the alleged deprivation impacts a protected interest. See Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997); Mallette v. Arlington Cnty. Employees' Supplemental Ret. Sys. II, 91 F.3d 630, 634 (4th Cir. 1996).

Plaintiff does not have a constitutionally protected right to be housed in any particular prison. "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges . . . [are] matters which every prisoner can anticipate." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). See Luken v. Scott, 71 F.3d 192, 193-94 (5th Cir. 1995) (noting that the effect of a classification reduction on the ability to earn good-time credits is too speculative to constitute a deprivation of a protected liberty interest). Plaintiff does not describe "an atypical and significant hardship" in relation to the ordinary incidents of prison life. Wilkinson v. Austin, 545 U.S. 209, 224 (2005). Plaintiff received numerous ICA hearings where simple, non-discretionary calculations were made that quantified plaintiff as a higher-risk inmate who needed to be at a more secure facility. Furthermore, Hatfield's affidavit demonstrates that prison officials reviewed evidence and determined that plaintiff was a direct threat to the safety of KMCC staff and that he should be placed in segregation and transferred to a correctional facility that matched his security level. Accordingly, plaintiff fails to identify any protected interest or to establish that Garman, Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn violated the Fourteenth Amendment, and they are entitled to qualified immunity for this claim.

14

5. Garman, Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn are entitled to qualified immunity for allegedly violating the First Amendment.

Plaintiff accuses Garman, Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn of retaliating against plaintiff for filing complaints, grievances, and letters. Inmates' claims of retaliation are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994)). To succeed on a § 1983 retaliation claim, plaintiff must allege facts sufficient to demonstrate that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams, 40 F.3d at 75. Plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive, the complained of incident . . . would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). Plaintiff must also demonstrate that he suffered some adverse impact or actual injury. ACLU of Md.. Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993).

Plaintiff's conclusory allegations of retaliation are insufficient to establish an actionable retaliation claim. Adams, 40 F.3d at 74. Plaintiff does not have a constitutional right to access the VDOC grievance procedures or Institutional Ombudsman. See id. at 70 (finding inmates do not have a constitutional right to access grievance procedures). Plaintiff also fails to describe a causal connection between sending numerous grievances and letters and these defendants' responses to plaintiff's disobedience, fasting, or grievances. Plaintiff merely relies on the fact that certain events followed certain other events, and he does not establish any retaliatory motive. Moreover, plaintiff does not describe an adverse impact or actual injury. Accordingly, Garman,

15

Mathena, Kiser, Vass, Kelly, Cox, Hatfield, and Horn are entitled to qualified immunity for this claim.

6. Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity for allegedly being deliberately indifferent and failing to protect plaintiff.

Plaintiff accuses Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn of being deliberately indifferent and failing to protect plaintiff from Childress' use of the NOVA shield. I have already determined that the NOVA shield did not constitute excessive force in violation of the Eighth Amendment. Consequently, these officers could not have been aware of a constitutional violation occurring in their presence. See Farmer v. Brennan, 511 U.S. 825, 838 (1994) (noting that a failure to protect claim requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk); Willis v. Oakes, 493 F. Supp. 2d 776, 784 (W.D. Va. 2007) (holding that plaintiff must prove a violation of a constitutional right as a prerequisite to establishing bystander liability). Accordingly, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity for claims of failure to protect and deliberate indifference to the use of the NOVA shield.

7. Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity for allegedly failing to clean the strip cell or give plaintiff cleaning supplies on February 9, 2009.

Plaintiff accuses Cox, Horn, Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn of causing him to be incarcerated in a "filthy" and "unclean" cell. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Farmer, 511 U.S. at 832. An inmate alleging an unconstitutional condition of confinement must describe an

16

objectively serious deprivation of a basic human need and how a prison official subjectively knew of and disregarded the inhumane nature of the confinement. Id. at 837.

Plaintiff fails to describe an objectively serious harm or a deprivation of a minimal necessity of civilized life. Plaintiff uses adjectives like "filthy" and "unclean" to describe the cell's cleanliness, but labels and conclusions are insufficient to state a claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Plaintiff does not allege that he suffered any injury from being in the strip cell. Instead, plaintiff complained of the mere possibility of contracting various illnesses, which is an insufficient basis for Eighth Amendment liability. See Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) ("If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged conditions, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment."). While the Constitution protects prisoners from cruel and unusual living conditions, an inmate is not entitled to relief because he has been exposed to uncomfortable, restrictive, or inconvenient conditions of confinement, like a poorly-flushing toilet or unpleasant smells. See Henderson v. Virginia, 2007 U.S. Dist. LEXIS 70207, at *26, 2007 WL 2781722, at *7 (W.D. Va. Sept. 21, 2007) (unpublished). Rather, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

Plaintiff also fails to describe these defendants' deliberate indifference. Plaintiff does not controvert Horn's subjective belief that the cell was clean or show that any of these defendants saw the "filth" that caused the cell to be unconstitutionally inhumane. Although plaintiff complains that he did not have immediate, physical access to soap, toothpaste, and other incidentals inside the strip cell, he does not explain how staff absolutely deprived him of the

17

minimal necessities of civilized life. See, e.g., Rhodes, 452 U.S. 347. Accordingly, Cox, Horn,

Tuggle, Brown, Webb, Walk, Childress, Allen, and O'Quinn are entitled to qualified immunity

for this claim.

8. Johnson and Jabe are entitled to qualified immunity for allegedly violating the First
Amendment with their policy about religious fasts.

Plaintiff accuses Johnson and Jabe of violating the First Amendment by failing to provide

appropriate services, opportunities, or reasonable assistance to all legitimate and accepted

religious groups when choosing to fast in accordance with their respective religious beliefs.

Specifically, plaintiff alleges:

> Also, in regards to the "policy" prescribed by defendants Gene M. Johnson and
> John Jabe which does not extend the religious fasting rights to prisoners
> housed in segregation units, unless you are Sunni or Nation of Islam Muslims
> fasting during the month of Ramadan.[13] At that time, the Muslim prisoners
> who choose to participate in the fasting of Ramadan[] are allowed to sign a
> four hour "agreement" swearing to either consume or discard the provided
> dinner-bag ("suhoor-meal") within the prescribed four hour time-frame. That
> "privilege," which should be considered as a fundamental constitutional right.
> [sic] Unfortunately it is not afforded to all world renowned religious groups.
> All religious groups that are recognized as being legitimate in this case should
> be given the right to fast in accordance with our respective religious beliefs.
> As it appears at this time, the policy is not necessary to serve a compelling
> interest. If that was to be the case, then quite obviously "Ramadan" would not
> have been a matter worth mentioning. The right to fast sincerely and lawfully
> needs to be established under all conditions of confinement of prisoners. And,
> that right must be available and furnished on a daily basis, not solely during the
> month of Ramadan. Therefore, I find this matter to be a violation under the

---

[13] Ramadan is a month-long religious fast observed by traditional Muslims. During this fast, meals are made available only to inmates who require special religious diets during Ramadan fasting and for the purpose of accommodating these Muslim inmates' sincere religious practices. During Ramadan, the VDOC makes special accommodations for these Muslim offenders to be fed at night. The VDOC Special Programs Manager avers that providing individual inmates with special feeding arrangements whenever they choose to fast would be expensive and burdensome to the VDOC and its staff, would disrupt the orderly operation of the prison, and would permit inmates to become manipulative when requesting this special provision whenever they chose to fast. Additionally, prison food services staff must report to work earlier and stay later for meal preparation. This change in working hours usually causes overtime charges, requires changes in work schedules that cause reduced supervision during normal hours, and increases the number of security staff working at night. Plaintiff alleges that he is a Sunni Muslim.

First Amendment's Religious Freedom and a violation under 42 U.S.C.
§ 2000cc (RLUIPA).

Plaintiff missed seventeen consecutive meals in February 2009, allegedly because he was fasting in accordance with unspecified Sunni-Islamic beliefs. Plaintiff believes that Johnson and Jabe have the authority to extend VDOC policies about Ramadan fasting to all religious groups and observers who wish to fast outside of Ramadan and to provide the same food service options given to Muslim inmates during Ramadan for inmates who fast at anytime for any personally religious reason.

Plaintiff fails to identify Johnson's or Jabe's personal conduct, or fault or another person's conduct or fault in executing Johnson's or Jabe's policies or customs, that caused a violation of the First Amendment. See Fisher v. Washington Metropolitan Area Transit Author., 690 F.2d 1133, 1142-43 (4th Cir. 1982), abrogated on other grounds by Cnty. of Riverside v. McLaughlin, 500 U.S. 44 (1991) (finding that § 1983 requires a showing of personal fault on the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs). Johnson's and Jabe's positions in the VDOC hierarchy are not sufficient bases of § 1983 liability. See Monell, 436 U.S. at 663 n.7 (stating respondeat superior is not a sufficient basis for § 1983 liability).

Plaintiff fails to establish that Johnson and Jabe, or any other defendant who executed Johnson's or Jabe's policies, knew that plaintiff was exercising a religious right. Plaintiff does not aver that he ever informed any KMCC staff that he was fasting for a religious reason. No documentation exists in plaintiff's prison records that indicate he informed KMCC staff that he was religiously motivated to fast during January and/or February 2009. Defendants aver that

19

plaintiff engaged in a hunger strike, either for not receiving the Common Fare Diet[14] or for having a higher security classification. Furthermore, plaintiff fails to identify a policy, custom, or practice that caused a denial of a religious right to fast beyond the fact that KMCC officials moved plaintiff to a strip cell; plaintiff does not allege that any prison staff forced him to eat food or break the fast.

Even if the defendants were aware that plaintiff was observing an unspecified Sunni-Muslim religious fast, Johnson's and Jabe's alleged policy about Ramadan food service options did not violate the First Amendment. The Free Exercise Clause of the First Amendment extends to prison inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's constitutional rights must be evaluated within the context of incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Procunier v. Martinez, 416 U.S. 396, 405 (1974) (dictum). Thus, I "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006).

This deference is achieved by a rational basis test. I consider four factors to determine if a prison regulation is reasonably related to legitimate penological interests:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff,

---

[14] Common Fare is a specific VDOC inmate menu of foods commonly permitted by numerous faiths.

inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner v. Safley, 482 U.S. 78, 89 92 (1987)). When applying these factors, I must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

The evidence demonstrates that Ramadan is a month-long religious fast observed by traditional Muslims, and inmates observing Ramadan are fed at night.[15] Due to the alternate feeding times, Food Services staff must report to work earlier and stay later for Ramadan meal preparation. These requirements usually create overtime and the adjustment of staff's schedules, which limits staff supervision during normal work hours and causes additional security staff to be present during Ramadan feeding.

Providing individual offenders with special feeding arrangements whenever they choose to fast without notice would be expensive and burdensome to the VDOC and its staff. Furthermore, allowing each inmate to choose when to fast like during Ramadan would grant each inmate the power to manipulate VDOC staff and the orderly operation of a prison. Accordingly, plaintiff fails to establish that Johnson's and Jabe's alleged policy of not allowing plaintiff to fast in accordance with the VDOC Ramadan feeding policy when Ramadan is not occurring does not violate the First Amendment, and Johnson and Jabe are entitled to qualified immunity.

---

[15] In 2008, Ramadan began in September and ended in October. In 2009, Ramadan began in August and ended in September.

21

C.    PLAINTIFF CANNOT SUCCEED AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

1.  Plaintiff cannot recover damages against the defendants in their official capacities and equitable relief about KMCC conditions is moot.

Plaintiff names Johnson, Jabe, Garman, Mathena, Kiser, and Cox in their official capacities to receive damages and injunctive relief. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citation omitted). The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity extends to "arms of the State," including state agencies and state officers acting in their official capacity. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Virginia has not waived its sovereign immunity to § 1983 and RLUIPA damages actions and is not a "person" for purposes of § 1983 damages actions. Will, 491 U.S. at 71, 86.

A state official named in an official capacity when sued for injunctive relief is a "person" subject to § 1983. Id. at 71 n.10. However, plaintiff is no longer housed at the KMCC, and thus, plaintiff's requests for injunctive relief with respect to his incarceration there are moot. Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007).

2.  Plaintiff is not entitled to equitable relief for the RLUIPA claim.

RLUIPA, in relevant part, provides that no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). "Government" includes the defendants, who work for the

22

VDOC. Id. § 2000cc-5(4)(A). A "substantial burden" on religious exercise occurs if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." Lovelace, 472 F.3d at 187. "Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7).

To determine whether a plaintiff establishes a prima facie RLUIPA claim, a court must decide whether a plaintiff sincerely held the avowed belief and whether the belief is, in a plaintiff's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965). Only a personal practice that is both sincerely held and rooted in religious belief falls under the protections of RLUIPA. See Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) (noting that under RLUIPA, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic" and whether his "professed religiosity" is "sincere"); Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972) (applying the same metric to First Amendment religious claims). "Evidence of nonobservance is relevant on the question of sincerity" but is not "conclusive of insincerity." Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir. 1988) (recognizing that "an inmate may adopt a religion merely to harass the prison staff with demands to accommodate his new faith"). Distinguishing between religious and secular beliefs, sincere or insincere, is difficult. See, e.g., Frazee v. Illinois Emp't Sec. Dep't., 489 U.S. 829, 833 (1989). Nevertheless, sincerity of belief is the critical, threshold aspect of the inquiry I must consider: whether plaintiff's asserted religious belief that required him to fast

23

during January and February 2009 was a belief "sincerely held and . . . in [his] own scheme of things, religious" at that time. Seeger, 380 U.S. at 185.

I find that plaintiff fails to establish that the January and February 2009 fast arose from a sincerely held religious belief. Plaintiff does not provide any basis for me to conclude that the fast had anything to do with a religious observance. Plaintiff does not relate how he is a Sunni Muslim to any religious need to fast in January or February 2009. Plaintiff does not describe how the fast furthered his religious adherence or was pursuant to any religious belief. Furthermore, plaintiff does not provide any evidence that he ever informed prison staff of a religious need to fast or needed to be provided foods pursuant to the VDOC Ramadan policy when Ramadan was not occurring.

Moreover, plaintiff also fails to explain how the government imposed a substantial burden by weighing him or placing him in a strip cell, in which plaintiff had access to personal property. Plaintiff does not describe how any governmental act or policy forced him to end the fast earlier than what the unknown "religious reason" required. Accordingly, plaintiff fails to state a prima facie RLUIPA claim because he does not establish that a sincerely held religious belief motivated the January and February 2009 fast.

Even if plaintiff had established prima facie evidence of a substantial burden to a religiously sincere fast, defendants adequately explained that applying the Ramadan feeding policy only during Ramadan is the least restrictive means of furthering a compelling governmental interest. Id. § 2000cc-1(a). See Cutter, 544 U.S. at 723 (noting that due deference must be given to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline that are consistent with consideration of costs and limited resources). VDOC officials explained that

24

implementing the Ramadan feeding policy for each individual inmate who wants to fast at any time for any alleged religious reason would unduly disrupt security and food services to other inmates and would permit each VDOC inmate to manipulate prison resources. Accordingly, plaintiff is not entitled to unspecified equitable relief for the RLUIPA claim.[16]

### III.

For the foregoing reasons, I grant defendants' motions for summary judgment.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

**ENTER**: This 21st day of August, 2012.

Senior United States District Judge

---

[16] Plaintiff's requested equitable relief is to make defendants assign or transfer him to a Level III facility. He does not request specific equitable relief about the RLUIPA claim or a specific VDOC policy, which would apply to any VDOC facility in which he would be incarcerated.

25